UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EMILY STONE,

                          Plaintiff,

                                                            5:21-CV-1363
v.                                                          (GTS/TWD)

TOWN OF CICERO; and KYLE HARRINGTON,
individually,

                          Defendants.
_____

APPEARANCES:                                        OF COUNSEL:

WEISBERG & ZUKHER, PLLC                              DAVID E. ZUKHER, ESQ.
    Counsel for Plaintiff
109 South Warren Street, Suite 711
Syracuse, NY 13202

SUGERMAN LAW FIRM LLP                                BRITTANY LEE HANNAH, ESQ.
    Counsel for Defendants                          PAUL V. MULLIN, ESQ.
211 West Jefferson Street                           JENNA WHITE KLUCSIK, ESQ.
Syracuse, NY 13202

GLENN T. SUDDABY, United States District Judge

## <u>**DECISION and ORDER**</u>

Currently before the Court, in this civil rights action brought by Emily Stone ("Plaintiff")

against the Town of Cicero and police officer Kyle Harrington ("Defendants"), is Defendants'

motion for summary judgment pursuant to Fed. R. Civ. P. 56.   (Dkt. No. 36.)   For the reasons

set forth below, Defendants' motion for summary judgment is granted and Plaintiff's Complaint

is dismissed.

## I.      RELEVANT BACKGROUND

### A.      **Plaintiff's Complaint**

Generally, in her Complaint, Plaintiff asserts eight specifically enumerated claims.    (Dkt. No. 2.)    First, Plaintiff claims that Defendant Harrington committed the tort of assault, specifically that he "engaged in physical conduct by using unreasonable and excessive force against Plaintiff, which placed [her] in imminent apprehension of harmful contact" by "violently tackl[ing]" Plaintiff to the ground.    (*Id.* at ¶¶15, 21-26.)    She further claims that Defendant Town of Cicero is vicariously liable for the actions of Defendant Harrington because he was acting within the course and scope of his employment with the Cicero Police Department.    (*Id.*)

Second, Plaintiff claims that Defendant Harrington committed the tort of battery based on the same conduct, and that Defendant Town of Cicero is vicariously liable for the actions of Defendant Harrington because he was acting within the course and scope of his employment with the Cicero Police Department.    (*Id.* at ¶¶ 27-32.)

Third, Plaintiff claims that Defendant Harrington committed the tort of intentional infliction of emotional distress ("IIED") by "brutally assaulting" her when he tackled her as discussed above while acting in his capacity as a police officer.    (*Id.* at ¶¶ 33-38.)

Fourth, Plaintiff claims that Defendant Harrington committed the tort of negligent infliction of emotional distress ("NIED") based on the same conduct underlying the previous claims.    (*Id.* at ¶¶ 40-44.)

Fifth, Plaintiff claims that Defendant Town of Cicero was negligent in the hiring, retention, or training of Defendant Harrington and that such negligence in ensuring that Defendant Harrington was properly trained and qualified for his job caused Plaintiff's injuries. (*Id.* at ¶¶ 45-51.)

Sixth, Plaintiff claims that Defendant Harrington used excessive force against her in

2

violation of 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution by physically assaulting her as discussed above without reason, cause, or justification, and that such actions took place under the auspice of policies or customs by Defendant Town of Cicero of tolerating police misconduct and encouraging such misconduct by its deliberate indifference in supervising, training, or disciplining officers.   (*Id.* at ¶¶ 52-63.)

Seventh, Plaintiff also asserts a claim for excessive force under 42 U.S.C. § 1983 against Defendant Harrington individually based on the same conduct, and alleges that his willful, deliberate, malicious, or reckless disregard for Plaintiff's constitutional rights entitles her to punitive damages.   (*Id.* at ¶¶ 64-69.)

Eighth, Plaintiff claims that Defendant Town of Cicero should be held liable for the conduct of Defendant Harrington under *Monell* because their own policy or custom "enabled its agents and employees to act with deliberate indifference to Plaintiff's constitutional" rights.   (*Id.* at ¶¶ 70-73.)

### B.    Procedural History

Plaintiff originally filed her Complaint with the Supreme Court of the State of New York, Onondaga County, on November 17, 2021.   (Dkt. No. 2.)   Defendants filed a notice of removal to this Court on December 21, 2021, on the basis of this Court's original jurisdiction over the action related to Plaintiff's asserted constitutional claims.   (Dkt. No. 1.)

On June 30, 2022, following a telephone status conference, the parties submitted a stipulation of dismissal, agreeing that the Cicero Police Department should be dismissed from the action with prejudice.   (Dkt. No. 19.)   The undersigned approved that stipulation and ordered dismissal of the Cicero Police Department as a defendant on the same date.   (Dkt. No.

3

20.)   As a result, the only remaining defendants in this action are Defendant Town of Cicero and Defendant Harrington.

### C.   Undisputed Material Facts on Defendants' Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."   *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'"   *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendants, and either expressly admitted or denied without a supporting record citation by Plaintiff.

1.      The incident that is the subject of this case occurred on June 6, 2021.

2.      As of that date, Plaintiff had a ten-year-old daughter named C, and a
fifteen-year-old daughter named H.

3.      Michael Douglas is the father of C.

4.      Plaintiff and Mr. Douglas were never legally married.

5.      Plaintiff and Mr. Douglas' relationship had ended before June 6, 2021.

6.      As of June 6, 2021, Mr. Douglas was married to Emily Douglas.

7.      On June 6, 2021, Plaintiff and Mr. Douglas were sharing custody of C, but there
was no formal custody order in place.

8.      On June 6, 2021, Defendant Harrington was employed as a police officer with the
Cicero Police Department ("CPD").

9.      At all relevant times on that day, Defendant Harrington was acting within the
scope of his employment with the town.

10.     On June 6, 2021, Ashley Smith was a patrol officer with CPD.

11.     Officer Smith was the senior officer on the scene of the incident.

12.     Officer Smith was not Defendant Harrington's supervisor.

**Events Earlier in the Day on June 6, 2021**

13.     Plaintiff picked up H from her father's house and then spent about an hour with
both H and C at the home of Mr. Douglas' parents.

14.     Plaintiff testified that she drove both children to her home.

15.     Plaintiff testified that, after dropping her children off at home, she left again to
buy cigarettes at a gas station.

5

16.     On her way to the gas station, Plaintiff struck a neighbor's mailbox with her vehicle.

17.     Plaintiff damaged the mailbox when she hit it with her vehicle.

18.     After hitting the mailbox, Plaintiff kept driving.

19.     Plaintiff purchased a pack of cigarettes and a beer at the gas station.

20.     Plaintiff left the gas station and drove home.

21.     The owner of the mailbox came to Plaintiff's house and Plaintiff admitted having hit the mailbox, apologized, and offered to replace it.

22.     A couple of days before June 6, 2021, Plaintiff had stopped taking her prescribed anxiety medication, Lexapro, because she "wasn't liking how [she] was feeling."

**Mrs. Douglas Calls 911 and Defendant Harrington is Dispatched to the Scene**

23.     At 6:54 p.m., Mrs. Douglas called 911.

24.     The 911 Center is part of Onondaga County's Department of Communications.

25.     The 911 Center is not part of the Town of Cicero, and is not staffed by town employees.

26.     Mrs. Douglas told the 911 operator that her stepdaughter C had called her crying and was concerned because Plaintiff was "doing some inappropriate things," and was drinking while driving.

27.     Mrs. Douglas told the 911 operator that C told her that Plaintiff was not "acting right" and had not taken her medications.

28.     Mrs. Douglas told the 911 operator that C asked her to come pick her up.

29.     Mrs. Douglas told the 911 operator that she wanted police to be there when C left

Plaintiff's house because she wanted to make sure it was okay that she took C.

30.     Mr. Douglas was not scheduled to have C.

31.     The 911 operator told Mrs. Douglas that he was "going to enter this as a domestic call."

32.     The 911 Center dispatched this call as a domestic call.

33.     The 911 Center, not CPD, dispatches officers.

34.     Defendant Harrington was dispatched to the scene.

35.     No other cars were available to respond to the scene.[1]

36.     The CPD policy on Domestic Violence and Family Offenses defines a "domestic incident" as follows: "[A]ny dispute, act of violence, or report of an offense between individuals within a family or household where police intervention is requested.   A domestic incident is not necessarily a violation of law."

37.     The CPD policy on Domestic Violence and Family Offenses defines "[m]embers of the same family or household" as those who (a) are related by consanguinity (blood relation) or affinity (a familial relation resulting from marriage), (b) are legally married to one another, (c)

---

[1]     Plaintiff objects to this asserted fact, arguing that body camera and other evidence shows that Defendant Harrington did not call for back-up until well into his investigation at the scene, that he was texting and calling Officer Smith (despite asserting that all other officers were working on other calls), and that, when he did request back-up, Officer Smith arrived almost immediately.   (Dkt. No. 40, Attach. 4, at ¶ 37.)   Although the facts Plaintiff cites are correct and supported by the record, none of them contradict the testimony of both Defendant Harrington and Officer Smith that, at the time of dispatch, no other units were available.   Body camera footage does show Defendant Harrington attempting to call Officer Smith, but it also establishes that Officer Smith was in the process of investigating a hit-and-run incident for part of the time Defendant Harrington was on the scene.   (Dkt. No. 28, Exh. A, at 0:14.26-0:14:30 [in which Defendant Harrington states to Mr. and Mrs. Douglas approximately fourteen minutes after arriving on the scene, "my partner's working on a hit-and-run right now"]; 0:23:30-0:27:20 [Defendant Harrington attempts to call Officer Smith multiple times before finally reaching her].)   There is no evidence to suggest that any other officer was available at the time Defendant Harrington was dispatched through when Officer Smith and others arrived at the scene.   This

were formerly married to one another regardless of whether they still reside in the same

household, (d) have a child in common regardless of whether such persons have been married or

have lived together at any time, (e) are not related by consanguinity or affinity but are or have

been in an 'intimate relationship' regardless of whether such persons have lived together at any

time, with an intimate relationship being defined considering factors such as the nature or type of

the relationship (regardless of whether the relationship is sexual in nature), the frequency of

interaction between the persons, and the duration of the relationship, with neither a casual

acquaintance nor ordinary fraternization between two individuals in business or social contexts

being deemed to constitute an intimate relationship.

38.     The CPD policy on Domestic Violence and Family Offenses defines "Domestic

Violence" as all designated family offenses as defined by N.Y. Crim. Proc. L. § 530.11(1) and

N.Y. Fam. Ct. § 812(1), plus a list of "acts or offenses between members of the same family or

household," as that term is defined in Section III(B) of the policy.

39.     The fact that this was dispatched as a "domestic" call does not mean that this was

a domestic call as that term is defined by CPD's policies and procedures.

40.     Officer Smith testified that "911 categorizes a call that is close to as possible that

they can dispatch.   For example, we might get dispatched to an assault.   It ends up being a

harassment.   It ends up being a disorderly conduct.   They dispatch it for whatever they believe

is the closest to that call."

**Defendant Harrington Arrives at the Scene and Conducts an Investigation**

41.     Defendant Harrington arrived at the scene at 7:10 p.m.

42.     When Defendant Harrington arrived, Mr. and Mrs. Douglas were in the street near

fact is therefore deemed to be admitted.

their red pickup truck in front of Plaintiff's house.

43.     When Defendant Harrington arrived, C and Plaintiff's dog, Rex, were already in the Douglases' pickup truck.

44.     When Defendant Harrington arrived, Mrs. Douglas approached him.

45.     Mrs. Douglas was the first person Defendant Harrington interviewed.

46.     Mrs. Douglas explained to Defendant Harrington that her stepdaughter, C, had called her sobbing, stating that Plaintiff had been drinking and had gotten into an accident, and that Plaintiff was not making sense, and asking Mrs. Douglas to come pick her up.

47.     Mrs. Douglas explained that she and her husband were not supposed to have C that night, and she wanted it documented that they had to come pick up C outside of their normal hours because Plaintiff was incapable of caring for her.

48.     Defendant Harrington testified that, at the time he arrived on the scene, he did not believe this was a domestic call because there was no domestic relationship between Plaintiff and Mrs. Douglas.

49.     Defendant Harrington entered Plaintiff's house with her consent.

50.     Defendant Harrington smelled the odor of alcohol in Plaintiff's house.

51.     Defendant Harrington interviewed Plaintiff in her house.

52.     Plaintiff told Defendant Harrington that Mrs. Douglas had pushed her down in her neighbor's driveway.

53.     Plaintiff showed Defendant Harrington her elbows and he observed the injuries to them.

54.     Plaintiff told Defendant Harrington that she had not "taken [her] meds in a couple

of days" because she did not like the way they "ma[de] her feel."

55.    Plaintiff told Defendant Harrington that she had an Order of Protection against

Mr. Douglas.

56.    Plaintiff showed Defendant Harrington a copy of that Order.

57.    She told him that "the Order is, like, fucked up, it's not accurate."

58.    The Order of Protection states in relevant part as follows:

> NOW, THEREFORE, IT IS HEREBY ORDERED that
> Michael J. Douglas . . . observe the following conditions of
> behavior:
> > [14] Refrain from communication or any other
> > contact by mail, telephone, e-mail, voice-mail or other
> > electronic or any other means with Emily Stone . . .
> > including by and through third parties;
>
> > [02] Refrain from assault, stalking, harassment,
> > aggravated harassment, menacing, reckless endangerment,
> > strangulation, criminal obstruction of breathing or
> > circulation, disorderly conduct, criminal mischief, sexual
> > abuse, sexual misconduct, forcible touching, intimidation,
> > threats, identity theft, grand larceny, coercion, unlawful
> > dissemination or publication of intimate image(s) or any
> > criminal offense against Emily Stone . . . including by and
> > through third parties;
>
> > [15] Refrain from intentionally injuring or killing
> > without justification the following companion animal(s)
> > (pet(s)) Rex.

59.    Plaintiff and Mr. Douglas had shared Rex while they were together.

60.    The Order of Protection does not state who owned Rex.

61.    The Order of Protection does not expressly prohibit Mr. Douglas from taking Rex,

only that he may not injure or kill Rex or otherwise act in a manner that might constitute

harassment or any of the other listed prohibited activities against Plaintiff.

62.     Plaintiff told Defendant Harrington that Rex was in Mr. Douglas' truck.

63.     Plaintiff did not tell Defendant Harrington that either Mr. or Mrs. Douglas had entered her house and taken Rex.

64.     Neither Mr. Douglas nor Mrs. Douglas entered Plaintiff's garage or house at any time while Defendant Harrington was on the scene.

65.     Plaintiff did not at any time assert to Defendant Harrington that Mr. Douglas had either injured or killed Rex.

66.     Mr. Douglas in fact did not injure or kill Rex at any time while Defendant Harrington was on the scene.

67.     While Defendant Harrington was questioning Plaintiff in her house, Plaintiff stated that she "got [a] PC to fucking download the 99 text messages that [Mr. Douglas] sent me the fucking Thursday night before I actually filed the paperwork."

68.     Plaintiff told Defendant Harrington that Mr. Douglas had been contacting her since the Order of Protection was issued, but that she did not want to have it assessed as a violation of the Order because they were "just talking about, like, our kid."

69.     Plaintiff did not show Defendant Harrington any texts she had received from Mr. Douglas, nor did she offer to show him any of those messages.

70.     Plaintiff was aware that Mr. and Mrs. Douglas were there to pick up C, as well that C had contacted them because she wanted to be picked up.

71.     Plaintiff told Defendant Harrington that she was fine with Mr. and Mrs. Douglas taking C.

72.     Plaintiff stated that she wanted to press charges against Mrs. Douglas for pushing

her down in her neighbor's driveway and showed Defendant Harrington her elbows multiple times.

73.    Defendant Harrington told Plaintiff that he was going to talk to Mrs. Douglas to get "her side of the story" and that Plaintiff should take a breath and have a cigarette, and "they would get it all figured out."

74.    Defendant Harrington told the Plaintiff that he would be "right back."

75.    Plaintiff testified that Defendant Harrington had instructed her to stay on her property.

76.    After Defendant Harrington spoke with her, Plaintiff drank a beer in her garage.

77.    Defendant Harrington exited Plaintiff's house and went to speak with Mr. and Mrs. Douglas.

78.    Defendant Harrington told Mrs. Douglas that Plaintiff wanted to press charges against her for pushing her down.

79.    Mrs. Douglas told Defendant Harrington that Plaintiff had pushed her and broken her finger.

80.    Mrs. Douglas stated that she wanted to press charges against Plaintiff.

81.    Defendant Harrington explained the consequences of pressing charges against Plaintiff to Mrs. Douglas.

82.    Specifically, Defendant Harrington stated to Mrs. Douglas that, "If you both want to press charges against each other, you're both probably going to go to jail, okay?   I might be able to talk to both of you and get you both not to press charges against each other and then you guys can go on your way."

83.     During this conversation, Defendant Harrington obtained biographical and contact information for Mr. and Mrs. Douglas.

84.     Mrs. Douglas told Defendant Harrington that a neighbor, Pat, was a witness to the altercation she had with Plaintiff.

85.     Defendant Harrington returned to his vehicle, where he found the Order of Protection on his patrol vehicle computer, reviewed it, and printed it.[2]

86.     Defendant Harrington approached Plaintiff, who was in her driveway.

87.     He explained the consequences of pressing charges against Mrs. Douglas, particularly that, if she pressed charges against Mrs. Douglas, Mrs. Douglas was intending to press charges against her.

88.     Defendant Harrington explained to her that the charge against both of them would be harassment in the second degree.

89.     Plaintiff told Defendant Harrington that she still wanted to press charges against Mrs. Douglas.

90.     Plaintiff then told Defendant Harrington that her neighbor had witnessed the altercation.

---

[2]     Plaintiff states that she "does not object" to this asserted fact, but adds legal argument regarding how such fact should be interpreted.   (Dkt. No. 40, Attach. 4, at ¶ 103.)   Because Plaintiff has not properly denied the asserted fact, and because a statement of material facts is not the place for the assertion of legal arguments, this fact is deemed to have been admitted.   *See Checksfield v. Internal Revenue Serv.*, 21-CV-1180, 2024 WL 21549, at *3 n.9 (N.D.N.Y. Jan. 2, 2024) (Suddaby, J.) (noting that "legal arguments are inappropriate in a response to a statement of material facts"); *Boger v. New York State Off. of Parks, Recreation & and Historic Preservation*, 17-CV-0289, 2019 WL 2766897, at *2 (N.D.N.Y. July 2, 2019) (D'Agostino, J.) (deeming admitted responses to statement of fact wherein the nonmovant indicated she had no dispute but added immaterial facts or legal argument).

91.     Defendant Harrington walked to the neighbor's house and spoke with him.[3]

92.     The neighbor, Pat, told Defendant Harrington that "neither one of the girls hurt each other," that it looked like they were trying to grab each other's hands, and that Plaintiff "fell because she was drunk" and could not get back up.[4]

93.     Defendant Harrington walked past Plaintiff, who was still in her driveway, and spoke briefly with Mr. and Mrs. Douglas, including about the terms of the Order of Protection.

94.     Defendant Harrington returned to his vehicle and spoke to Officer Smith on his cell phone.

**Defendant Harrington Takes Plaintiff to the Ground**

95.     Plaintiff decided on her own to get Rex out of the Douglases' truck.[5]

---

[3]     This asserted fact is deemed to have been admitted for the same reasons discussed in Note 2.

[4]     Plaintiff states in response that she "does not object to the fact that Plaintiff's neighbor advised Officer Harrington as set forth[above].   Plaintiff objects that same hearsay statement is material, relevant, or even admissible as evidence in the motion at bar."   (Dkt. No. 40, Attach. 4, at ¶ 111.)   However, what Defendant Harrington knew about the circumstances involving Plaintiff's behaviors and mental state is relevant and material to Plaintiff's claims, particularly her federal excessive force claim.   Further, the Court is not convinced by Plaintiff's assertion that the statements of the neighbor are inadmissible hearsay for the purposes of this motion, given that Defendant Harrington's body camera footage documents the neighbor speaking these words regarding his own observations of what occurred between Plaintiff and Mrs. Douglas. Moreover, to the extent that the body camera footage or citations to deposition testimony by Defendant Harrington contain hearsay, such evidence could be provided in an admissible form at trial and therefore should not be excluded from consideration on this motion.   *See Bowling v. Nolette*, 18-CV-0597, 2021 WL 4134733, at *7 n.3 (N.D.N.Y. Sept. 10, 2021) (Suddaby, C.J.) ("[E]vidence considered on a motion for summary judgment need not be in an admissible form, so long as it 'can be presented in a form that would be admissible in evidence.'") (citing Fed. R. Civ. P. 56[c][2]).

[5]     Plaintiff states that she does not dispute the asserted fact, but instead adds other facts in order to contextualize such fact.   (Dkt. No. 40, Attach. 4, at ¶ 114.)   However, the response to the movant's statement of material facts is not the proper place to assert additional facts.   *See* N.D.N.Y. L.R. 56.1(b) (indicating that the nonmovant's response to a statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the

96.     Plaintiff testified that "when [Defendant Harrington] did not return with my dog or make any attempts to retrieve my dog, and he was talking with my ex and his wife, I went to retrieve my property, my dog, myself from the truck."

97.     She further testified that "after [Defendant Harrington] was over talking to them for — it seemed, again, for, like, a long time, and he did not seem to be doing anything to return my dog to me, I went over to retrieve my dog myself."

98.     Plaintiff testified that, before she went to get the dog, Defendant Harrington had told her to stay on her property or in her house.

99.     Plaintiff was required to leave her house and her property in order to cross the street to where the Douglases' truck was parked.[6]

100.    Defendant Harrington left his vehicle and ran towards the truck.[7]

101.    Plaintiff was standing next to the driver's side of the truck.

102.    Plaintiff testified that her daughter, C, was holding Rex's collar and was resisting her efforts to take Rex.[8]

---

movant's assertions in a short and concise statement, in matching numbered paragraphs," and that they should assert any other facts that they believe are in dispute "in a short and concise Statement of Additional Material Facts in Dispute").   Because Plaintiff has not denied or objected to the asserted fact, that fact is deemed to have been admitted.

[6]     This fact is deemed to have been admitted for the same reasons discussed in Notes 2 and 5.

[7]     This fact is deemed to have been admitted for the same reasons discussed in Note 2.

[8]     Plaintiff states that she does not dispute that when she went to retrieve Rex from the truck, C was holding Rex's collar, but that she does dispute the characterization that C was "resisting her efforts to take the dog."   (Dkt. No. 40, Attach. 4, at ¶ 121.)   However, after reviewing the relevant cited deposition testimony, the Court sees nothing misleading about such characterization, as Plaintiff testified that she was "trying to get my little one to let go of Rex's collar," and, in response to a question about whether C was willing to let go of the dog or was continuing to hold it in response to Plaintiff's efforts to take it, Plaintiff stated that C "held the

103.    Mr. Douglas was standing to Plaintiff's left, also next to the truck.

104.    Defendant Harrington took Mr. Douglas' right arm and pulled him away from the truck.

105.    Mr. Douglas yelled, "She's trying to take my fucking kid and my dog."[9]

106.    Defendant Harrington turned back toward Plaintiff, called her name twice, and told her to "go in the house."

107.    Plaintiff did not leave the side of the truck.

108.    Plaintiff continued to reach into the window of the truck's driver-side door.

109.    Defendant Harrington pulled Plaintiff by her right arm and they ended up on the ground.[10]

110.    Plaintiff described the takedown as a "football tackle."

111.    From the time Defendant Harrington started to exit his patrol vehicle, to the time he and Plaintiff landed on the ground, less than 20 seconds had elapsed.

112.    Mr. Douglas did not have any contact with Plaintiff while Defendant Harrington was on the scene, until Plaintiff approached the truck to get Rex.

113.    Mrs. Douglas did not have any contact with Plaintiff while Defendant Harrington

---

dog" and was in fact resisting her efforts to take Rex.   (Dkt. No. 36, Attach. 7, at 52, 54.)   This asserted fact is therefore deemed to have been admitted.

[9]    Plaintiff's answer to this asserted fact is non-responsive.   (Dkt. No. 40, Attach. 4, at ¶ 124.)   This fact is therefore deemed to have been admitted.

[10]    Plaintiff disputes this characterization, citing evidence in an attempt to show that Defendant Harrington intended to take Plaintiff to the ground and that the force that caused her injuries was not accidental.   (Dkt. No. 40, Attach. 4, at ¶ 128.)   However, the asserted fact does not explicitly assert that Defendant Harrington's act of bringing Plaintiff to the ground was accidental or unintentional; the statement that they "ended up on the ground" is in fact an entirely neutral characterization.   Because Plaintiff's denial is not responsive to the asserted fact, this fact is deemed to have been admitted.

was on the scene, until Plaintiff approached the truck to get Rex.

114.   The New York State Domestic Incident Report prepared by Defendant Harrington states in part as follows:

> . . . Emily Stone exited the residence and attempted to remove the dog from Michael's truck . . . Michael attempted to physically stop Emily Stone from taking the dog by yelling, pushing, and blocking Emily Stone with his body.   At this time I attempted to intervene to prevent an escalation between the two parties; Michael obliged by verbal commands and backed off but Emily continued pulling on the dog and attempting to open the truck door.   As she ignored my commands, I attempted to guide Emily away from the truck via a pull on her elbow, which was unsuccessful.   Emily continued her actions at which point she was forcibly pulled from the truck and grounded to de-escalate her actions.

115.   Defendant Harrington made physical contact with Plaintiff with the intention of removing her from the truck.[11]

116.   When Defendant Harrington was on the ground with Plaintiff, he smelled the odor of alcohol.

117.   After Plaintiff was brought to the ground, Defendant Harrington placed her right hand behind her back, and then her left hand, and handcuffed her.

118.   Defendant Harrington did not place a knee on or near Plaintiff's left shoulder while he was handcuffing her.

---

[11]   Plaintiff disputes this asserted fact, citing to a statement in Defendant Harrington's declaration that "Emily continued her actions at which point she was forcibly pulled from the truck and grounded to de-escalate her actions."   (Dkt. No. 40, Attach. 4, at ¶ 135.)   It is not clear what Plaintiff is disputing, as the evidence she cites supports that Defendant Harrington engaged Plaintiff with the intention to pull her away from the truck.   To the extent that Plaintiff appears to be attempting to dispute an implied fact that Defendant Harrington did not intend to bring her to the ground, such denial is not appropriate.   *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).   This fact is therefore deemed to have been admitted.

119.   Defendant Harrington did not "rip" Plaintiff's left arm out from underneath her in in order to handcuff her.[12]

120.    Plaintiff did not complain of pain while Defendant Harrington handcuffed her.

**Expert Report of Robert Faynor**

121.    On or about September 1, 2022, Plaintiff disclosed Mr. Faynor as her expert witness in this case.

122.    In his Investigative Report, Mr. Faynor concluded that "the 'take-down' itself although a little aggressive was a good 'take-down.'"

123.    Mr. Faynor testified that Plaintiff "was a threat to the safety of the scene."

124.    Mr. Faynor also testified that it was appropriate to arrest Plaintiff.

125.    Mr. Faynor does not have any training in medicine.

126.    Mr. Faynor does not have any experience in biomechanics.

127.    Mr. Faynor does not have any training that would allow him to testify to a biomechanical event as to what caused Plaintiff's injuries.

128.    Mr. Faynor did not review any radiological films before rendering his opinion in the case.

129.    Mr. Faynor did not review any medical records before rendering his opinion in this case.

130.    Mr. Faynor testified that he did not recall seeing Defendant Harrington pull Plaintiff's left arm behind her in the body camera footage.

131.    Mr. Faynor testified that taking Plaintiff's hands and handcuffing her did not

---

[12]    Plaintiff does not directly dispute this asserted fact but instead states that the Court should rely on the body camera footage itself rather than any characterization of that footage asserted by Defendants.   (Dkt. No. 40, Attach. 4, at ¶ 140.)   Because the body camera footage does not

violate any police practice.

132.     Mr. Faynor testified that it was appropriate to arrest Plaintiff and to use whatever force was necessary to complete that arrest.

### Events After Plaintiff Was Taken to the Ground

133.     While Plaintiff was on the ground, Defendant Harrington asked her, "What did I tell you to do?" and she responded, "Go in the house."

134.     Plaintiff apologized to Defendant Harrington, and told him that she just wanted her dog.

135.     After Defendant Harrington helped her sit up, Plaintiff told him, "My shoulder's fucked up."

136.     When Plaintiff asked Defendant Harrington why he had tackled her, he stated "Because I told you to let go and get away from the truck, but you didn't listen."

137.     Plaintiff apologized multiple times, saying again that she wanted her dog.

138.     Defendant Harrington called an ambulance for Plaintiff's shoulder.

139.     Defendant Harrington helped Plaintiff stand and placed her in the back seat of his patrol vehicle.

140.     Defendant Harrington asked Plaintiff if she was still interested in pressing charges against Mrs. Douglas.

141.     In response, Plaintiff told Defendant Harrington that Mrs. Douglas was a social worker at a school and that she "wouldn't want to fuck with [Mrs. Douglas'] job."

142.     Plaintiff indicated to Defendant Harrington that, out of respect for Mrs. Douglas' job, she would not press charges against Mrs. Douglas as long as Mrs. Douglas did not press

---

materially conflict with the asserted fact, the asserted fact is deemed to have been admitted.

charges against her.

143.    Officer Smith arrived at the scene at 7:47 p.m.

144.    Defendant Harrington related the facts he had uncovered during his investigation to Officer Smith, including that Plaintiff was drunk and fell on the stone driveway.

145.    During this conversation with Officer Smith, Defendant Harrington referred to Plaintiff three times as "Drunk E" or "Drunk Emily" and referred to Mrs. Douglas as "this Emily."[13]

146.    Defendant Harrington used these terms to differentiate between the two women on the scene, both of whom were named Emily.

147.    Defendant Harrington testified that, at the time, these terms were the easiest descriptor.

148.    He testified that he did not mean these terms in a negative way.

149.    While Defendant Harrington was still on the scene, the owner of the mailbox Plaintiff had hit earlier in the evening arrived at Plaintiff's house.

150.    The owner of the mailbox told Defendant Harrington that Plaintiff had apologized for hitting the mailbox and told the owner she was texting at the time.

151.    Defendant Harrington told Mrs. Douglas that Plaintiff was not going to press charges against her because she was respectful of her job, and asked whether Mrs. Douglas still wanted to press charges against Plaintiff.

152.    Mrs. Douglas decided not to press charges against Plaintiff.

153.    Defendant Harrington informed Plaintiff that Mrs. Douglas had decided not to press charges against her.

---

[13]    This asserted fact is deemed to have been admitted for the reasons discussed in Note 2.

154.   Plaintiff stated, "If she doesn't do it to me, then I won't do it to her."

155.   While she was in Defendant Harrington's patrol vehicle, Plaintiff apologized to Defendant Harrington again, saying that she "didn't mean to disobey," but that she was "just trying to get the dog."

156.   Both Plaintiff and Mrs. Douglas signed Declination to Proceed forms.

157.   Plaintiff was evaluated by ambulance personnel at the scene.

158.   Plaintiff was taken to St Joseph's Hospital for evaluation of a possible dislocated shoulder.

159.   Defendant Harrington referred to Plaintiff as "Drunk Emily" again during a second conversation with Officer Smith about the incident between Plaintiff and Mrs. Douglas.

160.   Defendant Harrington issued tickets to Plaintiff for Aggravated Unlicensed Operation in the Third Degree in violation of N.Y. Veh. & Traf. L. § 511(1)(a), and leaving the scene of an accident that caused property damage in violation of N.Y. Veh. & Traf. L. § 600(1)(a).

**Events After the Incident on June 6, 2021**

161.   Defendant Harrington was not reprimanded or disciplined for his actions in this incident.

162.   Defendant Harrington had also never been disciplined previously relating to the performance of his duties for the CPD.

163.   On June 14, 2021, Sergeant Thomas Leo conducted a Use of Force review regarding this incident.

164.   In connection with that review, Sergeant Leo prepared a memorandum, in which

he described Defendant Harrington's actions during the use of force as follows:

> While [Defendant Harrington was] speaking with [Mr. Douglas], Stone exited the residence and began attempting to remove the Dog from the vehicle.   Douglas attempted to stop her when Ofc. Harrington instructed him to stop, which he did.   When he instructed Stone to stop she ignored him.   He attempted to remove her from the side of the vehicle.   She pulled away still ignoring his directions to stop and step away.
>
> Ofc. Harrington then forcefully removed Stone from the side of the vehicle, causing her to make contact with the ground.   Stone received a dislocated shoulder from the contact with the ground. Stone was transported to St. Joseph's Hospital via NAVAC.

165.    Sergeant Leo concluded that the "Use of Force was within Department Policy and was necessary under the circumstances."

166.    Sergeant Leo did not review Defendant Harrington's body camera footage.

167.    Sergeant Leo is not authorized to view the body camera footage because he is not a chief or a lieutenant.

### Defendant Harrington's Training

168.    Defendant Harrington attended the State Park Police Academy in 2018.

169.    At the Academy, Defendant Harrington received 40 hours of training in handling incidents of domestic violence.

170.    After completing the Academy, Defendant Harrington was employed by the State Park Police.

171.    Each year, Defendant Harrington attended annual refresher trainings in domestic violence, which were each approximately one hour long.

172.    The annual refresher trainings included reviewing domestic violence policy and procedure and de-escalation techniques.

173.    As of June 6, 2021, Defendant Harrington had been employed by the CPD for approximately four months.

174.    After he joined CPD, in February or March of 2021, he attended 10-to-12 hours of training in domestic violence and de-escalation.

175.    The training included CPD's policies regarding domestic violence incidents, CPD's procedures, and de-escalation techniques.

176.    Defendant Harrington testified that either Sergeant Snell or Officer Smith had trained him in domestic violence when he joined the CPD.

177.    Defendant Harrington also received training from the CPD in February 2021 on CPD's Rules of Conduct and policy on the Use of Physical Force.

178.    Sergeant Snell is in charge of training for CPD, but Plaintiff did not question him about whether he trained Defendant Harrington on domestic violence or any other topic.

179.    At her deposition, Officer Smith testified that her duties and responsibilities included being part of the training division, but Plaintiff did not question her about whether she trained Defendant Harrington on domestic violence or any other topic.

### D.    Parties' Arguments on Defendants' Motion for Summary Judgment

#### 1.    Defendants' Memorandum of Law

Generally, in support of their motion, Defendants make six arguments.   (Dkt. No. 36, Attach. 33.)   First, Defendants argue that Plaintiff's claims for excessive force, assault, and battery against Defendant Harrington should be dismissed because Defendant Harrington's conduct of pulling Plaintiff away from the truck and bringing her to the ground was objectively reasonable under the circumstances for the following reasons: (a) he already knew Plaintiff had

been in a physical altercation with Mrs. Douglas earlier; (b) he saw her reaching into the

Douglases' truck attempting to take the dog from C; and (c) Plaintiff did not respond to his

calling her name and telling her to go in her house, but continued to reach into the truck.   (*Id.* at

6-9.)   They further argue that, at the very least, Defendant Harrington is entitled to qualified

immunity on the excessive force claim because no reasonable person could disagree that his

actions were objectively reasonable, especially given that Plaintiff's own expert has opined that

the force used and the decision to arrest Plaintiff were warranted.   (*Id.* at 10.)   Relatedly,

Defendants argue that any potential claim based on the manner in which Defendant Harrington

handcuffed Plaintiff should be dismissed because (a) such basis was not raised in Plaintiff's

Complaint or her initial Notice of Claim, (b) in any event, the manner in which he handcuffed

Plaintiff, as documented by the body camera footage, was objectively reasonable and not

excessive, and (3) the expert's report cannot raise a genuine dispute of material fact regarding

this issue because he is unqualified to render any opinions about what actions by Defendant

Harrington caused Plaintiff's shoulder injury.   (*Id.* at 10-13.)

Second, Defendants argue that the excessive force, assault, and battery claims should also

be dismissed against Defendant Town of Cicero because (a) it cannot be held liable pursuant to

Section 1983 under the doctrine of respondeat superior, (b) there is no basis for the imposition of

*Monell* liability because there has been no constitutional violation, and, beyond that, no evidence

of a policy, custom, or practice or any deliberate indifference to sustain liability even if a

constitutional violation is found.   (*Id.* at 13-16.)

Third, Defendants argue that Plaintiff's claims for IIED and NIED should be dismissed

both because they are premised on the same conduct underlying the above-mentioned claims and

because Plaintiff cannot show, most importantly, that Defendant Harrington's conduct caused her an emotional injury.   (*Id.* at 16-18.)

Fourth, Defendants argue that Plaintiff's claim for negligent hiring, retention, and training should be dismissed because (a) Defendant Harrington was acting within the scope of his employment, (b) there is no evidence that Defendant Town of Cicero was aware of any propensity on the part of Defendant Harrington (because such propensity does not exist) to commit the kind of conduct that Plaintiff alleges caused her injury, and (c) the evidence undisputedly shows that Defendant Harrington was sufficiently trained.   (*Id.* at 18-20.)

Fifth, Defendants argue that Plaintiff's assertions of a claim of negligence premised on Defendant Harrington's alleged violation of CPD policies and procedures should be dismissed because, first and foremost, Plaintiff has not pled such a claim in her Complaint or her Notice of Claim.   (*Id.* at 20-22.)   Should the Court consider the claim on the merits, Defendant argues that it still must be dismissed for the following reasons: (a) negligence is not a basis of liability for constitutional torts under Section 1983; (b) a violation of internal police policies and procedures also does not, by itself, amount to a violation of a constitutional right; (c) Plaintiff cannot recover on a negligence claim because she has alleged that Defendant Harrington's conduct that caused her injury was intentional; (d) Plaintiff has not shown that Defendants owed her any special duty that would give rise to a negligence claim; (e) Plaintiff have not shown that Defendants violated any of CPD's policies or procedures through their actions, primarily because the incident was not properly a domestic case, but also because the evidence does not support a finding that Defendant Harrington either violated those provisions, or that any technical failure to comply to the letter of those policies was the proximate cause of Plaintiff's injury given that it

was her own conduct that necessitated Defendant Harrington to use force; and (f) notwithstanding all of the above, Defendants are entitled to immunity.   (*Id.* at 20-38.)

Sixth, Defendants argue that Plaintiff's request for putative damages should be dismissed because (a) as to Defendant Town of Cicero, punitive damages cannot legally be recovered against a municipality, and (b) there has been no showing that could even remotely support a finding that Defendant Harrington's conduct was intentional or motivated by a sufficiently malicious or reckless intent.   (*Id.* at 38-39.)

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiff makes five arguments.   (Dkt. No. 40, Attach. 5.)   First, Plaintiff states that she wishes to voluntarily withdraw her claims for IIED and NIED.   (*Id.* at 3.)

Second, Plaintiff argues that the incident qualified as a "domestic" from its inception according to the definition of the CPD itself based on the fact that (a) the dispatcher dispatched it as a domestic call, and (b) Mr. Douglas was present on the scene and the only reason for Mrs. Douglas to be there was to pick up C, the child of Plaintiff and Mr. Douglas.   (*Id.* at 4-5.)

Second, Plaintiff argues that Defendant Harrington violated CPD policies and procedures applicable to the handling of domestic cases by (a) being the only unit on the scene, despite the fact the policies require that two units be dispatched and present at a domestic scene, (b) failing to separate and maintain visual contact with the involved parties at all times, and (c) failing to conduct a complete investigation of the incident including the identities and relationships of all of the involved persons and whether there was probable cause to believe that a crime had occurred.   (*Id.* at 5-8.)   Plaintiff also argues that he further violated CPD rules of conduct

generally by (a) demonstrating a lack of knowledge regarding the laws to be enforced, (b) demonstrating unwillingness or inability to perform his job, and (c) failing to conform to CPD work standards.   (*Id.*)   As part of this argument, Plaintiff also argues that these repeated departures from policies preclude any application of discretionary immunity.   (*Id.* at 8-12.)

Third, Plaintiff argues that her claim for negligent retention should survive Defendants' motion because the review of Sergeant Leo that found Defendant Harrington did not violate any relevant rules or procedures was not based on consideration of the body camera footage, and such deficient review demonstrates that Defendant Town of Cicero was negligent in assessing whether Defendant Harrington should have been retained.   (*Id.* at 12-13.)

Fourth, Plaintiff argues that, contrary to Defendants' arguments, her Complaint does state a cause of action for negligence against Defendants through various allegations made within the Complaint, and that the evidence in the record shows at least a genuine dispute of material fact as to whether Defendant Harrington breached the special duty owed to Plaintiff based on the Order of Protection and CPD's "aggressive" mandatory arrest policy by failing to arrest Mr. Douglas and failing to comply with other CPD policies.   (*Id.* at 13-15.)

Fifth, Plaintiff argues that Defendants' motion contains a number of procedural defects, including the fact that their Statement of Material Facts contains legal conclusions and is not concise, the fact that the declarations of Defendant Harrington and Officer Smith are not notarized, and the fact that their arguments regarding negligence and violations of CPD policies and procedures are not supported by expert evidence.   (*Id.* at 15-17.)

### 3.   Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants make seven arguments.   (Dkt.

No. 43.)   First, Defendants argue that Plaintiff's claims premised on the use of force should be dismissed for the same reasons they asserted in their initial memorandum of law, noting that Plaintiff did not oppose any of those arguments in her response, but merely argued that no force would have been necessary had Defendant Harrington followed CPD policies and procedures, despite the fact that such facts are not alleged in the Complaint and that such argument is contrary to the law of the Second Circuit.   (*Id.* at 3-6.)

Second, Defendants argue that the use of force claims against Defendant Town of Cicero should also be dismissed because, again, Plaintiff has not directly opposed many of the arguments made by Defendants, and her proffered response that Defendant Town of Cicero's "policy" of not permitting Sergeant Leo to review body camera evidence when determining whether Defendant Harrington violated CPD's policies and procedures is evidence of deliberate indifference is not grounds for denying Defendants' motion because (a) that allegation was not raised in Plaintiff's Complaint, and (b) there is no evidence that such policy represents a persistent failure to discipline employees who are known to violate constitutional rights.   (*Id.* at 6-7.)

Third, Defendants argue that Plaintiff's IIED and NIED claims should be dismissed based on Plaintiff's indication that she wishes to withdraw such claims, given that she has essentially abandoned them and not opposed Defendants' motion as to them.   (*Id.* at 7-8.)

Fourth, Defendants argue that Plaintiff's claim for negligent hiring, retention, and training should be dismissed because Plaintiff has not opposed Defendants' arguments at all related to hiring and training, and she has not shown that any deficiencies in the post-incident review conducted by Sergeant Leo indicate that Defendant Town of Cicero knew *before* the

incident that he had a propensity to engage in the type of conduct that caused her injury.   (*Id.* at 8-9.)

Fifth, Defendants argue that any negligence claim Plaintiff now asserts should be dismissed because (a) the Complaint does not even imply such a cause of action related to a violation of any CPD policies or procedures, (b) she has not persuasively argued that she can show that Defendants owed her a special duty (especially given the undisputed evidence that Plaintiff did not rely on any actions by Defendant Harrington in that she attempted to take matters into her own hands related to recovering Rex), and (c) she has not raised a triable issue of fact that they violated any CPD policies or that such violations could constitute actionable negligence or the proximate cause of her injury.   (*Id.* at 9-16.)   Along with this argument, Defendants argue that the opinions of expert witness Mr. Faynor upon which Plaintiff principally relies for her negligence arguments are insufficient to create any genuine dispute of fact or preclude summary judgment because (a) they are based on erroneous factual assumptions, and (b) many of his opinions are inappropriate legal conclusions rather than proper expert testimony. (*Id.* at 15-16.)   They further argue that they are entitled to discretionary immunity.   (*Id.* at 16.)

Sixth, Defendants argue again that the request for punitive damages should be dismissed, asserting that Plaintiff has not offered any arguments in opposition to the relevant arguments in Defendants' initial memorandum of law.   (*Id.* at 16-17.)

Seventh, Defendants argue that their motion is not defective and complies with the relevant rules and statutes.   (*Id.* at 17.)

## II.    LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

29

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[14] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[15]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

---

[14]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[15]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."   *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.   *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).   What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[16]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[17]   Stated another way, when a non-movant fails to oppose a legal argument

---

[16]      Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

[17]      *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.   *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

### A.   Whether Plaintiff's Claims Related to an Intentional Use of Force Must Be Dismissed Based on the Undisputed Material Facts

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See, supra* Parts I.D.1 and 3.   To those reasons, the Court adds the following analysis.

As was discussed above, Plaintiff has asserted multiple claims related to an intentional use of force by Defendant Harrington: specifically, state-law claims for assault and battery, a claim for excessive force pursuant to 42 U.S.C. § 1983, and a *Monell* claim against Defendant Town of Cicero for the use of such allegedly excessive force.   Because all of these claims are premised on the same set of facts and are substantially identical, they will all be considered together.   *See Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) ("[E]xcept for § 1983's requirement that the tort be committed under the color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical.") (quoting *Posr v. Doherty*, 944 F.2d 91, 94-95 [2d Cir. 1991]).

The Court notes that, as an initial matter, although Plaintiff asserts facially that her claims

for assault, battery, and use of excessive force remain in dispute, the substance of her arguments focus almost entirely on a negligence claim based variously on Defendant Harrington's failure to follow CPD's domestic violence procedures and to enforce the Order of Protection.   (Dkt. No. 40, Attach. 5, at 4-17.)   Plaintiff makes no arguments as to why the force used in pulling Plaintiff to the ground while Defendant Harrington was attempting to get Plaintiff away from the Douglases' truck after she reached in and was attempting to get Rex away from C was excessive or unwarranted under the circumstances.   Indeed, the statements and conclusions of her own expert, Robert Faynor, seem to undermine any argument that it was excessive.   Mr. Faynor stated in his report that, although the "take down" was "a little aggressive," it was "a good 'take down.'"[18]   (Dkt. No. 40, Attach. 3, at 2.)   He further opines that "[Defendant] Harrington used the proper amount of force in effectuating the aggressive take-down of [Plaintiff]," and that the force was unnecessary only insofar as the situation in which that force was used would not have occurred but for Defendant Harrington's failure to follow CPD policy related to domestic violence situations.   (Dkt. No. 40, Attach. 1, at ¶ 38; Dkt. No. 40, Attach. 3, at 7.)   This qualification, while the basis for Plaintiff's negligence theory, is immaterial to the excessive force analysis, which is based upon what a reasonable officer would do under the circumstances presented at the time the force is used, regardless of what caused those circumstances.   *See*

---

[18]     Mr. Faynor does opine that "the excessive force used to cuff her to the extent of fracture is concerning," but Plaintiff does not make any allegations regarding the force used in the process of handcuffing her.   Rather, the Complaint alleges injury only based upon the act of "tackling" Plaintiff to the ground.   (Dkt. No. 2, at ¶¶ 15-16, 28.)   Further, there is no apparent basis for any belief by Mr. Faynor that Plaintiff's injury was caused by the act of handcuffing, and, as Defendants argue, mechanisms of injury do not appear to be within the scope of Mr. Faynor's expertise or experience.   (Dkt. No. 36, Attach. 13, at 8-9 [testifying that he has no training that would allow him to testify to a biomechanical event as to what causes a person's injuries], 31-32 [testifying that his opinions regarding whether the injury was caused by handcuffing is based on his experience as a police officer, not as a medical source (which he is not)]; Dkt. No. 40, Attach. 2.)

*Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996) (finding, in the context of an argument that the defendant was liable for excessive force because he created the situation in which deadly force became necessary, that the defendant's "actions leading up to the shooting are irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force [because] [t]he reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force") (collecting cases).   Further, given Plaintiff's emphasis on her negligence theory in her response memorandum, it is worth highlighting that "a claim that a state actor acted negligently [in failing to follow various police procedures such as carrying a radio or calling for back-up] does not state a deprivation of constitutional rights."   *Salim*, 93 F.3d at 92 (citing *Daniels v. Williams*, 474 U.S. 327 [1986]; *Davidson v. Cannon*, 474 U.S. 344 [1986]).

In this case, the undisputed facts, particularly as established clearly by Defendant Harrington's body camera, show that the force used was reasonable under the circumstances known to him at the time.   Prior to the use of force, Defendant Harrington had been informed by multiple people, including Mr. and Mrs. Douglas and Plaintiff's neighbor, that Plaintiff was under the influence of alcohol and had been in some type of accident while driving immediately prior to the Douglases' arrival, and he testified that he smelled alcohol in Plaintiff's house when he went inside to talk with her.   (Dkt. No. 28, Exh. A, at 0:00:50-0:01:03, 0:21:54-0:22:50; Dkt. No. 36, Attach. 8, at 84.)   Plaintiff also informed him soon after he began speaking with her that she had stopped taking her medication a few days prior.   (Dkt. No. 28, Exh. A, at 0:03:53-0:04:03.)   Body camera footages shows that Plaintiff's demeanor was agitated and anxious, and her responses were somewhat scattered and rambling.   (Dkt. No. 28, Exh. A, at

0:03:00-0:10:05.)   Defendant Harrington was aware, from Plaintiff's own statements, that, although there was an Order of Protection and it was premised in part on assertions that Mr. Douglas had hit her in the past, such accusations were incorrect and that he had in fact never hit her.  (Dkt. No. 28, Exh. A, at 0:05:05-0:05:30.)   She further had informed Defendant Harrington that, although the Order prohibited Mr. Douglas from having any communication with her, they had exchanged some text messages since it was issued, but that she had not wanted to have those communications be considered as a violation because they were talking only about C.   (Dkt. No. 28, Exh. A, at 0:06:22-0:07:12.)   Plaintiff also told him that her dog was in the Douglases' truck and that she believed that was a violation of the Order, but Defendant Harrington explained to her the Order only prevented Mr. Douglas from injuring or killing the dog, and that he would speak with the Douglases to determine what was happening; at no time did Plaintiff allege to Defendant Harrington that the Douglases had entered her home or physically taken the dog.  (Dkt. No. 28, Exh. Am at 0:03:00-0:10:05.)   Defendant Harrington was also aware that Plaintiff and Mrs. Douglas had been involved in some type of physical altercation before his arrival on the scene, but the details of that altercation were not clear because Plaintiff, Mrs. Douglas, and Plaintiff's neighbor (who witnessed the altercation) all provided different versions of what had happened.   Further, although the video clearly establishes that Mr. Douglas was angry and acting in a somewhat aggressive manner at times toward Defendant Harrington, there is no evidence establishing that he acted in an aggressive or threatening manner towards Plaintiff throughout the time that Defendant Harrington was present; rather, the only time Mr. Douglas is seen to have any interaction with Plaintiff beyond a few innocuous gestures with his hand is when Plaintiff was attempting to extricate Rex from the

truck immediately before Defendant Harrington brought Plaintiff to the ground.   (*See generally* Dkt. No. 28, Exh. A.)

As to the moment of the use of force itself, Defendant Harrington was in his patrol car speaking on the phone with Officer Smith regarding the situation when he had to rush to the truck in response to the sounds of yelling and Mrs. Douglas' requests for help.   (Dkt. No. 28, Exh. A, at 0:27:14-0:27:20.)   The body camera footage shows that Plaintiff was reaching into the truck, while Mr. Douglas was next to her seemingly attempting to get her to stop.   (Dkt. No. 28, Exh. A, at 0:27:22-0:27:28.)   Defendant Harrington pulled Mr. Douglas away from the truck by the arm, ordering him to "get the fuck out of here," before ordering Plaintiff, who was visibly still reaching into the truck, to "go in the house" seconds before grabbing her arm and pulling her, resulting in him bringing her to the ground after a brief scuffle.   (Dkt. No. 28, Exh. A, at 0:27:23-0:27:33.)

The video and other evidence clearly substantiates that the force used against Plaintiff in this instance was objectively reasonable.   Plaintiff, who Defendant Harrington had reason to believe was drunk, was actively reaching into the window of the truck where both her dog and C were seated; there were also other children in the back seat of the truck (Mrs. Douglas' children). At his deposition, Defendant Harrington testified that he grabbed her arm with the intention of "remov[ing] her from the truck," but that in the act of that they "both fell to the ground."   (Dkt. No. 36, Attach. 8, at 111-12.)   It was objectively reasonable for Defendant Harrington to attempt to remove Plaintiff from the situation, where it was unclear whether she would cause any injury to either her dog or one of the children in the truck, by pulling her arm and bringing her down to the ground (whether or not the act of bringing her to the ground was intentional) in order to

regain control of the situation and keep her away from the truck.

Because the force applied was objectively reasonable under the circumstances known to Defendant Harrington at the time, as substantiated by the undisputed evidence, Plaintiff's claims for excessive force, assault, and battery cannot succeed.   Further, because Plaintiff cannot establish a substantive violation against Defendant Harrington under 42 U.S.C. § 1983, Plaintiff's *Monell* claim against Defendant Town of Cicero related to the same conduct must also be dismissed.[19]

### B.   Whether Plaintiff's Remaining State Law Claims Should Be Dismissed

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See, supra* Parts I.D.1 and 3.   To those reasons, the Court adds the following analysis.

As an initial matter, the Court has the discretion whether to exercise supplemental jurisdiction over Plaintiff's remaining state law claims given that her federal claims have been dismissed.   *See Wright v. Musanti*, 887 F.3d 577, 582 n.2 (2d Cir. 2018) ("The district court may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had jurisdiction.") (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 [2d Cir. 1996]).   In deciding whether to exercise such discretion, the court must weigh "various factors, such as judicial economy, convenience, fairness, and comity."   *Wright*, 887 F.3d at 582 n.2 (citing *Nowak*, 81 F.3d at 1191).

The Court finds that such factors weigh in favor of exercising supplemental jurisdiction

---

[19]     Further, her IIED and NIED claims premised on the use of force must also be dismissed for the same reasons, as well as because she has not provided any evidence to establish the requisite emotional distress inherent to these claims.   In the alternative, these claims are dismissed because Plaintiff has expressed that she wishes to abandon such claims, as was discussed above.

in this case.   The parties have already conducted discovery, including obtaining expert testimony and reports, and have already expended a significant amount of time and resources into this litigation.   To require them to begin the process over, to some extent, in a state court would not be in the interests of judicial economy, especially given that the relevant decisive issues have already been briefed and presented on this motion.   Nor do the issues remaining present any apparent unresolved or unusually complex matters of state law that would caution against this Court exercising its discretion.   For these reasons, the Court will exercise its supplemental jurisdiction over Plaintiff's remaining state law claims.

### 1.    Negligent Hiring, Retention, or Training

The first remaining state law claim is asserted against Defendant Town of Cicero for "carelessly and negligently hiring/retaining and/or training police officers, including [Defendant] Harrington, who did not have the experience, training, and/or qualifications necessary to provide adequate assistance for Plaintiff."   (Dkt. No. 2, at ¶ 47.)   Plaintiff bases this claim on the fact that Defendant Harrington failed to properly enforce the Order of Protection or ensure Plaintiff's well-being and safety.   (*Id.* at ¶ 49.)   Beyond her Complaint, she argues generally that he also was not properly aware of the relevant rules and laws he was supposed to be applying in the situation that was presented on June 6, 2021.   (Dkt. No. 40, Attach. 5, at 7.)

Plaintiff does not appear to challenge the motion seeking dismissal of the portions of this claim related to hiring and training, but argues in response to Defendants' motion only that the claim for negligent retention should survive based on the fact that Defendant Harrington was not reprimanded for his violations of CPD policy in the events of June 6, 2021.   (Dkt. No. 40, Attach. 5, at 12-13.)   To be sure, there is no basis for a continuation of the portions of this claim

38

related to hiring and training.   The undisputed evidence shows that Defendant Harrington had no history of any disciplinary or other problems when he was hired by CPD, and also establishes that he has received yearly training on how to handle domestic violence situations in addition to his initial 40 hours of training on that subject when he attended the New York State Park Police Academy.   (Dkt. No. 36, Attach. 8, at 7-14.)   There is no evidence to show that the decision to hire Defendant Harrington or the relevant training provided to him was negligent.

As to his retention, Plaintiff argues specifically that Defendant Town of Cicero (or more properly the CPD, who is no longer a defendant in this action) had a policy that prohibited Sergeant Leo from reviewing Defendant Harrington's body camera footage when assessing whether he had violated CPD procedure on June 6, 2021, and that such policy means that the review conducted was not full and proper, and the finding that cleared Defendant Harrington of any violations is therefore the product of gross negligence.   (Dkt. No. 40, Attach. 5, at 12-13.)

"A cause of action for negligent hiring and retention requires allegations that an employer knew of its employee's harmful propensities, that it failed to take necessary action, and that this failure caused damage to others."   *Waterbury v. New York City Ballet, Inc.*, 168 N.Y.S.3d 417, 423 (N.Y. App. Div. 1st Dep't 2022).   "It is well established that the duty of care in supervising an employee extends to any person injured by the employee's misconduct."   *Waterbury*, 168 N.Y.S.3d at 424.   It is "essential" for the plaintiff to demonstrate that the defendant knew or should have known of the employee's propensity to commit the conduct that caused the injury, and that there was a connection between the defendant's negligence in hiring and retaining the employee and the plaintiff's injuries.   *Nellenback v. Madison Cnty.*, -- N.Y.S.3d --, 2024 WL 117175, at *1 (N.Y. App. Div. 3rd Dep't 2024).

Plaintiff's argument on this claim fails as a matter of law for the simple fact that she cannot show that the facts related to her argument (i.e., that the review of Defendant Harrington's conduct on June 6, 2021, was insufficient and negligent in a manner that makes their retention of him as an officer after June 6, 2021, a negligent action) were in any way the cause of her injury.   Plaintiff's injury had already occurred *before* the review of Defendant Harrington's conduct and therefore such review could not have been the source of any knowledge or the cause of her injuries.   Because there is no evidence to show that Defendant Town of Cicero had any basis to know Defendant Harrington had a propensity to commit violations of CPD rules and policies (if he did so here) before the circumstances that caused Plaintiff's injuries, the after-the-fact review of his conduct on that day, whatever it concluded, is immaterial to the claim Plaintiff has asserted in this instance.   Because she has not alleged that she was injured *after* any question arose regarding such propensity, Plaintiff's negligent retention claim must fail.

### 2.    Negligence

As a threshold matter, the Court must determine whether Plaintiff has sufficiently pled the negligence claim that represents the primary basis for her arguments.   As was discussed above, Plaintiff now asserts that her injuries were the result of Defendant Harrington's negligent failure to follow various CPD policies and procedures applicable to domestic violence incidents and to civility and basic job performance generally, as well as of Defendant Harrington's failure to enforce the Order of Protection by not arresting Mr. Douglas.

It appears undisputed that Plaintiff did not plead a separately enumerated claim for negligence that specifically addresses the claim now asserted in response to Defendants' motion.

Plaintiff does admittedly make various allegations pertaining to negligent conduct throughout the Complaint, and asserts multiple claims involving negligence, including the claims for NIED and negligent hiring, retention, or training.   However, such broad assertions of negligence do not necessarily give rise to an inference that the specific claim now asserted was reasonably asserted in the Complaint.

Notably, as to a negligence claim premised on violations of the domestic violence or other policies and procedures, the allegations in the Complaint do not provide any reasonable notice of such basis for liability.   Plaintiff broadly alleges that Defendant Harrington "negligently failed to control the actions of Mr. Douglas by repeatedly permitting Mr. Douglas to unlawfully enter the garage and home of Mrs. Stone," and that he "negligently failed to enforce the Order of Protection" related to the taking of her dog and "repeatedly ignored conduct by Mr. Douglas that was in direct breach and violation of the Order of Protection occurring in his presence."   (Dkt. No. 2, at ¶¶ 11, 14, 48.)   She never makes any allegations regarding a failure to follow CPD policies or procedures, related to domestic violence or otherwise.   As a result, the Court agrees that Plaintiff has not sufficiently pled any negligence claim based on such supposed violations, and she cannot rely on such a claim at this stage of litigation, having failed to make any effort to amend the Complaint.   *See Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) ("A party may not use his or her opposition to a dispositive motion as a means to amend the complaint.") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 [2d Cir. 1998]); *Gonzalez v. Metro-North Commuter R.R.*, 18-CV-10270, 2020 WL 230115, at *11 (S.D.N.Y. Jan. 15, 2020) (declining to address the merits of a retaliation claim that plaintiff did not plead in the complaint, but instead asserted in the response to the motion for summary judgment, finding

that "[a]llowing Plaintiff to constructively amend his complaint at this stage of the litigation

would unfairly prejudice Defendants"); *Matiyn v. Allen*, 06-CV-1503, 2010 WL 3880510, at *4

& n. 9 (N.D.N.Y. Sept. 28, 2010) (Suddaby, J.) (declining to let even a pro se plaintiff

constructively amend his complaint through his opposition to a motion for summary judgment)

(collecting cases).; *see also Troia v. City of New York*, 80 N.Y.S. 3d 117, 120 (N.Y. App. Div. 2d

Dep't 2018) ("[A] plaintiff cannot defeat an otherwise proper motion for summary judgment by

asserting, for the first time in opposition to the motion, a new theory of liability that was not

pleaded in the complaint or bill of particulars.").

 In the alternative, any claim based on violations of various CPD policies and procedures

fails for the simple fact that there is no evidence to show that such violations were a proximate

cause of Plaintiff's injuries.   Under New York law, a negligence claim requires a plaintiff to

plead and show three elements: (1) "a duty owed to the plaintiff by the defendant"; (2) "a breach

of that duty"; and (3) "injury proximately resulting therefrom." *Moore Charitable Foundation

v. PJT Partners, Inc.*, 40 N.Y.3d 150, 157 (N.Y. 2023).   "Courts in New York have concluded

that circumstantial evidence supports a finding of negligence 'if there is a strong link between (1)

an activity considered wrongful because it increases the risk that a particular type of harm would

occur and (2) the occurrence of that type of harm.'" *Zurich Am. Insur. Co. v. Niagara Mohawk

Power Co.*, -- F. Supp. 3d --, 2023 WL 8255000, at *11 (N.D.N.Y. Nov. 29, 2023) (McAvoy, J.)

(quoting *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, [2d Cir. 2023]).   "For

this causal link to be made out, however, there must be sufficient evidence of negligence on the

part of the defendant that increased the chances of the harm that occurred." *Zurich Am. Insur.

Co.*, -- F. Supp. 3d --, 2023 WL 8255000, at *11.   Although the plaintiff need not exclude every

other cause but the defendant's alleged negligence, he or she must adduce a sufficient showing that causation is "based on logical inferences to be drawn from the evidence, not upon speculation." *Id.*

Specifically, there is nothing to support Plaintiff's argument that the enumerated violations of policy and procedure caused her injury other than pure speculation that the presence of a second unit on the scene, maintaining visual contact with parties at all times, and conducting a more thorough investigation into the identity of Mrs. Douglas' children or the circumstances under which Rex was put into the Douglases' truck would have prevented the use of force here and, by consequence, Plaintiff's injury. Although it is possible that compliance with such policies (to the extent they were not complied with to the letter) could have resulted in Rex being returned to Plaintiff sooner such that she would not have tried to remove Rex from the truck herself, there is simply no evidence to substantiate that would have happened. Defendant Harrington was still in the middle of conducting an investigation into the incident between Plaintiff and Mrs. Douglas when Plaintiff went to the truck of her own volition, disobeying what she understood to be Defendant Harrington's order to stay on her property. It is undisputed that she never told Defendant Harrington anything that would have led him to know or believe that Mr. and Mrs. Douglas had entered her home and forcibly taken Rex. The fact that Plaintiff believes that Defendant Harrington should have prioritized resolving the issues with Rex over the altercation between her and Mrs. Douglas does not turn Defendant Harrington's actions into negligence. Further, it is pure speculation that the presence of another unit on the scene or an officer maintaining visual contact with her would have prevented the need to use force against Plaintiff if Plaintiff had attempted to engage in the conduct she did under those alternative

circumstances.   In short, Plaintiff's arguments that she would not have resorted to self-help if

Defendant Harrington had followed CPD policies and procedures is purely speculative and

cannot constitute the basis for a finding of proximate cause.

The only evidence Plaintiff has presented to support such arguments is that of expert

witness Mr. Faynor.   However, the Court is not convinced that his report and other statements

are sufficiently non-speculative to overcome this hurdle.   For instance, regarding the policy for

having two units on scene, Mr. Faynor states that "[i]t is reasonable to believe that had an officer

been with Ms. Stone, she would not have resorted to self-help in attempting to retrieve her dog

from the Douglas' vehicle, and this injury does not occur."   (Dkt. No. 40, Attach. 3, at 4.)   This

statement is no less speculative simply because it comes from an expert witness; Mr. Faynor

does not reveal any apparent basis for this belief, and indeed offers no reason to believe that the

presence of two units on the scene would inherently mean that the second officer would have

stayed with Plaintiff at all times.[20]   Expert witness testimony that is speculative is not

admissible.  *See Major League Baseball Props, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir.

2008) ("[P]roffered expert testimony should be excluded if it is speculative or conjectural.")

(internal quotation marks omitted); *see also Scism v. Ferris*, 18-CV-0672, 2022 WL 2915745, at

---

[20]      In his deposition, when questioned about whether his conclusions are speculative, Mr.
Faynor denied that characterization and asserted it was not speculative, stating that, "[i]f the
officer took control of the scene for the safety of everybody involved and of the other people in
the area, it would have had a definitely different outcome," and that, "[i]f he took control of the
scene and Michael was placed into a specific safe spot or had another officer there which is
required under the rule and regulation of the Town of Cicero, it never would have continued onto
what happened."   (Dkt. No. 36, Attach. 13, at 42-48.)   Later in the deposition he stated that,
"[w]hen Officer Harrington arrived at the scene and saw that it's obviously ongoing situation and
he was sent to a domestic, if he would have took custody of Michael Douglas and separated him,
secured him in his vehicle, somehow kept him from being a future problem because he's already
agitated, this never would have occurred the injuries to Ms. Stone."   (Dkt. No. 36, Attach. 13, at
85.)   Yet these explanations do not suggest why such conclusions are non-speculative; they
merely restate the conclusion itself.

*3 (N.D.N.Y. July 25, 2022) (Dancks, M.J.) ("[A]n opinion that is speculative or conjectural does not satisfy Rule 702 and should be excluded.").   Similarly, his opinions regarding the policy of separating and maintaining visual contact with the parties and conducting an investigation are not only in part based on erroneous factual information (i.e., that Defendant Harrington knew that the Douglases had entered Plaintiff's home and taken Rex),[21] but also on the speculative assumption that detaining the Douglases would have resulted in Rex being returned to Plaintiff sooner, such that Plaintiff would not have attempted to get him from the truck on her own.[22]   (*Id.* at 4-5.)   Again, there is no evidence to suggest that Defendant Harrington would have returned Rex before finishing his investigation into the other issues that had occurred, namely the altercation between Plaintiff and Mrs. Douglas, whether or not Mr. Douglas and/or Mrs. Douglas had been detained.   Both Plaintiff and Mr. Faynor lose sight of the fact that the harm alleged to Plaintiff was not caused by Mr. or Mrs. Douglas; it was caused by Defendant Harrington's use of force that was necessitated by Plaintiff attempting to remove Rex from the truck while Defendant Harrington was still conducting his investigation.[23]   Because

---

[21]   Mr. Faynor testifies at his deposition that he based his assumption that the Douglases had taken Rex from Plaintiff's house on the fact Rex was in the Douglases' truck, but he admitted other people were present in the truck other than Mr. and Mrs. Douglas and he does not know if one of those other people may have brought Rex to the truck.   (Dkt. No. 36, Attach. 13, at 48-49.)   His belief that Mr. and/or Mrs. Douglas had entered Plaintiff's home and taken Rex is therefore not supported by any evidence and cannot constitute a proper basis for his opinions.

[22]   Other asserted violations of procedure discussed by Mr. Faynor, such as being courteous to the public and not expressing opinions on lifestyle choices, have little bearing on Plaintiff's injury.

[23]   Further, to the extent that Mr. Faynor opines generically that certain violations are the "actual and proximate cause of Plaintiff's injury," those statements are legal conclusions that are not within the scope of expert witness testimony and therefore do not support summary judgment on these issues.   *See Sparta Com. Servs., Inc. v. DZ Bank*, 680 F. App'x 17, 19-20 (2d Cir. 2017) ("A district court properly rejects an expert's testimony when the testimony involved

Plaintiff offers only speculation that her injury would not have occurred had Defendant Harrington properly followed all the procedures related to investigating a domestic incident, she cannot show that such violations were the proximate cause of her injury.

As to Plaintiff's arguments regarding a claim of negligence based on the failure to enforce the Order of Protection, Plaintiff does include allegations that appear to provide notice of such a claim.   As discussed above, Plaintiff alleged that Defendant Harrington "negligently failed to enforce the Order of Protection" related to the taking of her dog and by "repeatedly ignor[ing] conduct by Mr. Douglas that was in direct breach and violation of the Order of Protection occurring in his presence."   (Dkt. No. 2, at ¶¶ 11, 14, 48.)   Indeed, the evidence reveals that Defendant Harrington was aware of two potential violations of the Order of Protection, namely (1) the physical altercation between Plaintiff and Mrs. Douglas, and (2) information received from Plaintiff not long after he arrived on-scene that Mr. Douglas had had communication with her in the form of text messages since the Order of Protection was issued.[24] Although Plaintiff did not necessarily plead facts specifically about either the altercation with Mrs. Douglas or the text messages, when the Complaint is construed liberally, the Court finds

---

qualitative opinions about an area outside the expert's field of expertise, or when the expert opines on witnesses' credibility or inappropriately draws legal conclusions.") (citing *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 G.3d 435, 444 [2d Cir. 1995]; *DiBella v. Hopkins*, 403 F.3d 102, 121 [2d Cir. 2005]); *see also Choi v. Tower Research Capital LLC*, 2 F.4th 10, 20 (2d Cir. 2021) ("Expert testimony that usurps the role of the factfinder or that serves principally to advance legal arguments should be excluded."); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("The use of expert testimony is not permitted if it will usurp ... the role of the jury in applying the law to the facts before it. When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.").

[24]      Given that the undisputed evidence shows that no individual on the scene, including Plaintiff, told or gave Defendant Harrington any reason to believe that Mr. or Mrs. Douglas had entered Plaintiff's house and forcibly taken Rex (and thereby committed a crime or otherwise harassed Plaintiff through the taking of Rex), the presence of Rex in the car at the relevant time

that the Complaint implies a claim of negligence related to a failure to enforce the Order of Protection that bears closer scrutiny.

However, such claim fails on its merits for the same reason discussed above related to Plaintiff's other negligence theory related to policy and procedure violations, namely the fact that there is no basis beyond speculation for finding that such failures to enforce the Order of Protection was a proximate cause of her injury.   Specifically, as discussed above, the only bases on which Defendant Harrington could have effected an arrest pursuant to the Order of Protection were (a) Mrs. Douglas' physical altercation with Plaintiff, which occurred before Defendant Harrington arrived on the scene, and (b) Plaintiff's statements that Mr. Douglas had been texting with her about C after the Order of Protection was issued.

As to the altercation with Mrs. Douglas, which, again, Defendant Harrington did not witness, the undisputed evidence shows that there were still significant issues of fact that Defendant Harrington needed to investigate before he could have reasonably concluded that arrest of *Mr. Douglas* was warranted (as he was the only individual against whom the Order of Protection was issued, *not* Mrs. Douglas).   Significantly, although Plaintiff stated during the initial interview in her house that Mrs. Douglas had attacked her and pushed her down, Mrs. Douglas provided a different version of events in which Plaintiff broke Mrs. Douglas' finger, and Plaintiff's neighbor, who witnessed the altercation, told Defendant Harrington that the two women had not actually fought, but had simply grabbed each other's hands and engaged in (what he termed) a few "bitch slaps" before Plaintiff fell down because she was drunk.   In addition to these vastly differing accounts of the altercation, the only indication of what the altercation was about comes from Plaintiff's statement that Mrs. Douglas charged at her and called her a

---

would not, by itself, give rise to a reasonable belief that the Protective Order had been violated.

"whore."   Although Mrs. Douglas had arrived with Mr. Douglas for the express purpose of taking C, there is no evidence to suggest that Defendant Harrington was negligent in failing to conclude, without further investigation, that Mrs. Douglas' actions towards Plaintiff (to the extent he could ascertain what those were at the time) were done at the direction of or on behalf of Mr. Douglas as opposed to out of her own personal volition and feelings about Plaintiff. Further, as will be discussed below, there is no evidence to show that arrest of Mr. Douglas pursuant to the Order of Protection would have altered the circumstances that led to Plaintiff's injury.

As to the text messages, it is true that the Order of Protection explicitly prohibits Mr. Douglas from communicating with Plaintiff, with no noted exception for communication regarding C.   Putting aside the fact that Plaintiff told Defendant Harrington she did not want to have Mr. Douglas violated for those communications regardless of what the Order of Protection said, Defendant Harrington did have reasonable cause on that basis to arrest Mr. Douglas for a technical violation of the Order, a fact that he seems to acknowledge through his own statements to Mr. Douglas.   (Dkt. No. 28, Exh. A, at 0:12:20-0:12:35.)   However, regardless of the existence of this violation (or any violation that could be construed from Mrs. Douglas' conduct), Plaintiff still has not shown how the failure to arrest Mr. Douglas at that time was the proximate cause of her injury.   Even assuming Defendant Harrington could have arrested Mr. Douglas and placed him in the police vehicle at that point, Plaintiff's injury was not caused by Mr. Douglas' continued unrestrained presence; it was caused by Defendant Harrington taking her to the ground after she reached into the Douglases' truck while attempting to retrieve Rex from C.   There is no basis other than pure speculation to assert that, had Mr. Douglas been arrested and placed in the

patrol vehicle when Defendant Harrington left Plaintiff's house to speak with the Douglases, events would not have unfolded exactly as they had in this case.   Specifically, Defendant Harrington would have still been required to investigate the altercation between Plaintiff and Mrs. Douglas, verify the terms of the Order of Protection, speak with Plaintiff's neighbor, and take all of the other actions he did before the use of force on Plaintiff occurred.   There is no evidence that would indicate that Mr. Douglas' arrest would have resulted in his returning Rex to her sooner such that she would not have engaged in the self-help actions she did, or that Defendant Harrington would not have responded to her conduct in the same way.   Such a speculative possibility that events would have taken a different course cannot turn Defendant Harrington's actions into the proximate cause of Plaintiff's injury.

Further, Plaintiff has also not adduced evidence to show that Defendants owed her a relevant duty that was breached in this case.   Because the relevant implied negligence claim is asserted against Defendants for actions taken in a governmental capacity (i.e., a circumstance under which "its acts are 'undertaken for the protection and safety of the public pursuant to the general police powers'"), Plaintiff must show that Defendants owed her a "special duty" beyond the duty owed to the public generally.   *See Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425-26 (N.Y. 2013) (recognizing that "[p]olice and fire protection are examples of long-recognized, quintessential governmental functions," as well as that "[i]t is the plaintiff's obligation to prove that the government defendant owed a special duty of care to the injured party because duty is an essential element of the negligence claim itself").   The New York Court of Appeals recognizes three situations in which such a special duty can arise: "(1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily

assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition."   *Applewhite*, 21 N.Y.3d at 426.   In her response memorandum, Plaintiff asserts a special duty based specifically upon the assumption of a voluntary duty as a result of the Order of Protection and CPD's mandatory arrest policy, under which an officer is required to arrest an individual about whom he or she has reasonable cause to believe has violated a duly served order of protection.   (Dkt. No. 40, Attach. 5, at 13-15.)

In order to show that a municipality voluntarily assumed a duty to a plaintiff under New York law, the plaintiff must satisfy four elements: (1) "an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured"; (2) "knowledge on the part of the municipality's agents that inaction could lead to harm"; (3) "some form of direct contact between the municipality's agents and the injured party"; and (4) "that party's justifiable reliance on the municipality's affirmative undertaking." *Howell v. City of New York*, 39 N.Y.3d 1006, 1008-09 (N.Y. 2022) (quoting *Ferreira v. City of Binghamton,* 38 N.Y.3d 298, 312-13 [2022]).   Defendants are correct that the New York Court of Appeals recently affirmed that "the mere existence of an order of protection, standing alone, will not prove justifiable reliance" to create a special duty.   *Howell*, 39 N.Y.3d at 1009 (internal alterations omitted).

Regarding assumption of an affirmative duty through promises or actions, it is undisputed that Defendant Harrington did not make any promise or action to do anything other than to figure out what was going on between Plaintiff and Mrs. Douglas and with Plaintiff's dog; he did not promise that he would bring Plaintiff's dog back to her, either immediately or at any specific

time, or that he would arrest Mr. Douglas.   The only thing he stated he would do affirmatively during his relevant conversations with Plaintiff was that he would pursue the filing of charges against Mrs. Douglas for the physical altercation between the two women.   The more plausible basis for the assumption of an affirmative duty through promises or actions is the fact that CPD has a mandatory arrest policy in situations where there is cause to believe an Order of Protection has been violated.   Yet the Court need not decide whether this is indeed sufficient to constitute an affirmative promise or action, because Plaintiff has failed to establish multiple other elements required to show the existence of a special duty.

Even if the mandatory arrest policy, in conjunction with the Order of Protection, could be construed as an affirmative promise or action, there is no evidence to suggest that Defendant Harrington had knowledge that inaction could lead to harm.   Although Plaintiff had been in some form of physical altercation with Mrs. Douglas before Defendant Harrington's arrival on the scene, there has been no evidence submitted that Mrs. Douglas continued to pose an ongoing threat to Plaintiff, and, notwithstanding, the Order of Protection was against only Mr. Douglas (meaning Defendant Harrington had no duty or cause to arrest *Mrs. Douglas* for a violation of the Order of Protection until he had sufficient time to investigate whether Mrs. Douglas acted at the behest of or on behalf of Mr. Douglas).   As to Mr. Douglas, although it is apparent from the video evidence that he was angry and somewhat aggressive when interacting with Defendant Harrington, he at no time approached or had any interaction with Plaintiff on the scene while Defendant Harrington was there before Plaintiff herself went to the Douglases' truck.   Plaintiff's generic argument that Defendant Harrington should have known that his failure to arrest Mr. Douglas could lead to harm because domestic violence incidents often lead to injury ignores the

fact both that Defendant Harrington had no indication that Mr. Douglas posed a threat to Plaintiff (particularly as Plaintiff herself had told Defendant Harrington during their initial conversation that Mr. Douglas had never hit her) and that the injury Plaintiff suffered in the end was not because of Mr. Douglas, but because of Defendant Harrington's use of force to remove her from the truck.   Again, Mr. Douglas did not cause Plaintiff's injuries here.   Consequently, Defendant Harrington's failure to comply with the mandatory arrest policy did not actually lead to the harm that occurred here, and there was no reason that he should have known a failure to arrest Mr. Douglas (or even both Douglases) could lead to him needing to tackle Plaintiff when she attempted to retrieve Rex on her own from the truck.

Further, regarding the fourth criteria for a voluntarily assumed special duty, rather than relying on any presumed promise that Defendant Harrington would enforce the Order of Protection (which in her mind included bring Rex back to her) and arrest Mr. Douglas pursuant to the mandatory arrest requirement, Plaintiff disobeyed what she admits she understood to be an order by Defendant Harrington to stay on her property while he conducted his investigation and went to the truck to retrieve Rex herself, without waiting for any permission from Defendant Harrington to do so.   Plaintiff's actions in resorting to self-help because she wanted Rex back quicker do not suggest any justifiable reliance on any actions taken by Defendant Harrington or on any promise flowing from the mandatory arrest policy and Order of Protection.   Indeed, unlike Plaintiff's speculative arguments regarding proximate cause discussed above, there is no question raised by the evidence that Defendant Harrington would not have needed to use force against Plaintiff in the same way (and thus she would not have been injured in the manner she was) had she remained on her property and not chosen to approach the truck.   No reasonable

person could conclude based upon the evidence presented that Plaintiff was injured by any reliance on Defendant Harrington's actions or the mandatory arrest policy, and thus she cannot show that a special duty existed.

      For all of the above reasons, Plaintiff has not met her burden to show that there is any genuine dispute of material fact regarding a negligence claim based on facts that were explicitly asserted in the Verified Complaint, and therefore summary judgment is appropriate.

      **ACCORDINGLY**, it is

      **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 36) is **<u>GRANTED</u>**; and it is further

      **ORDERED** that Plaintiff's Complaint (Dkt. No. 2) is **<u>DISMISSED</u>**.

Dated: March 20, 2024
     Syracuse, New York

Glenn T. Suddaby
U.S. District Judge